UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| JODY GUNTER, § | |
|     Plaintiff § | |
| § | |
| v. § | Civil Action No. 6:18-cv-10 |
| § | |
| LARRY MORGAN, Individually And § | |
| LARRY MORGAN RACING, INC. § | |
|     Defendants § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, **JODY GUNTER** ("Plaintiff" or "Gunter") files this Second Amended Complaint against Defendant, **LARRY MORGAN** ("Defendant" or "Morgan"). Plaintiff filed his Original Petition in the 170th District Court in McLennan County, Texas on November 9, 2017, and filed an Amended Petition on December 1, 2017. Defendant filed a Notice of Removal on January 9, 2018.

### PARTIES

1. Plaintiff, Jody Gunter, is an individual residing in McLennan County, Texas.

2. Defendant, Larry Morgan, is an individual residing at his residence at 4798 McKinney Crossing Rd NE, Newark, Ohio 43055. Defendant has made an appearance in this case.

3. Defendant Larry Morgan Racing, Inc. is a foreign corporation organized under the laws of the State of Ohio, with its principal office located at 5398 Horns Hill Road NE, Newark, Licking County, Ohio. Defendant Larry Morgan Racing, Inc. engages in business in Texas but does not maintain a regular place of business in Texas or a designated agent for service of process, and this suit arose from Defendant Larry Morgan Racing, Inc.'s business in Texas. Defendant has made an appearance in this case.

## JURISDICTION

4. Defendant Larry Morgan is not a resident of Texas. However, the Defendant purposefully availed himself of the laws and resources of the State of Texas when he contracted with Plaintiff, a Texas resident, and shipped goods to the Plaintiff in Texas under the terms of that contract. Further, Defendant committed a tort in Texas which is the subject of this suit.

5. Larry Morgan, Inc. is not a Texas corporation, it is organized and has its principal office in the State of Ohio.

6. Defendant filed a Notice of Removal on January 9, 2018 on the basis of diversity jurisdiction under 28 U.S.C. §1332.

## VENUE

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Further, venue is proper in this district under 28 U.S.C. §1446 because it is the district and division in which the matter was pending in state court prior to removal.

## CONDITIONS PRECEDENT

8. All conditions precedent to Plaintiff's claim for relief have been performed or have occurred. Plaintiff provided written notice of the above claims to the Defendant on October 31, 2017, allowing the Defendant 7 days to respond and tender payment. The standard 60-day notice period was rendered impracticable because the Plaintiff needed to file suit to stop the running of limitations. TEX. BUS. & COMM. CODE § 17.505(b).

## VICARIOUS LIABILITY

9. Any reference below to "Defendant" or "Morgan" or any other mention of Larry Morgan throughout this pleading includes Larry Morgan Racing, Inc., a corporation which Larry Morgan owns and operates and that is engaged in the business of building and selling pro-stock racing

cars, engines, and other parts and equipment. Larry Morgan and Larry Morgan Racing, Inc. are jointly and severally liable based on various legal theories of vicarious responsibility. Under Texas law, owners and corporate officers are considered to be vice-principals of the corporation, creating corporate liability for the tortious acts of the vice-principal, including fraud. The traditional common-law theories of vicarious liability, including agency and respondeat superior, are also sufficient to create vicarious liability for violations of the DTPA. Agency law also creates corporate liability for contracts entered into by a corporation's officers and directors. Thus, Larry Morgan as an individual and Larry Morgan, Inc. are jointly and severally liable for all the claims asserted in the paragraphs below.

## FACTS

10.     Plaintiff Jody Gunter runs a specialty mechanic's shop in McLennan County, Texas, and he also participates in NHRA pro-stock drag racing events. Gunter was persuaded to begin NRHA pro-stock drag racing by Defendant Larry Morgan, who not only talked Gunter into joining the class, but also offered to help Gunter obtain all the parts and equipment he needed to begin racing, including an engine for his car. Morgan is in the business of selling parts and building and repairing engines to compete in pro-stock drag racing events. Morgan would regularly offer to purchase a part on Gunter's behalf, and Gunter would give Morgan money to make the agreed purchases. Gunter relied on Morgan's experience and expertise throughout the entire process, including Morgan's representation that the parts Gunter was purchasing from Morgan were new.

11.     Originally, Gunter and Morgan agreed that Gunter would lease an engine from Morgan so that Gunter could compete in the September 2014 NHRA Fall Nationals in Dallas. As the race date approached, it became clear to Gunter that the engine would not be ready in time, and he reached out to Morgan about the possibility of leasing the engine for a race in Las Vegas that was to take place just over a month later.

12. Morgan became upset over this news and informed Gunter that he was experiencing money problems, and that he was counting on the money that Gunter would pay to lease the engine in order to keep his business afloat. Gunter decided to pay Morgan in advance to lease the engine so that Morgan could continue doing business. As the race in Las Vegas approached, Morgan and his wife Diane put increased pressure on Plaintiff to purchase the engine outright as opposed to leasing it. During the course of their negotiations, Gunter and Morgan decided to skip the Las Vegas race and concentrate on the 2015 season opener in Pomona, California, which allowed Morgan more time to make further modifications to the engine.

13. As the 2014 season ended, Gunter and Morgan had further discussions regarding the purchase of the engine, with Morgan putting continued pressure on Gunter to purchase the engine outright. Morgan's demeanor left Gunter feeling uneasy about his ability to recover his initial $12,000 advance payment to lease the engine. During these discussions, Morgan continued to convince Gunter of the engine's quality, and the value of the deal being offered by Morgan. At one point, in an effort to further persuade Gunter, Morgan provided dynamometer test sheets to demonstrate the engine's power. Finally, Gunter was convinced and he agreed to purchase Morgan's engine for $35,000. Gunter paid Morgan an additional $23,000 over a ten-month period, bringing his total payments to $35,000 for the engine alone.

14. Gunter met Morgan at the October 2015 Fall Nationals in Dallas to take possession of the engine. With a desire to make sure that the engine had the qualities and characteristics as represented by Morgan, Gunter had the engine inspected by professionals at Reher-Morrison Racing Engines (RMRE). RMRE are professionals who are well-regarded in the racing community and who were familiar with both Gunter and Morgan. The mechanics at Reher-Morrison inspected the engine over the course of several weeks, and reported to Gunter on November 12, 2015 that the engine was totally defective and that it would need a further $25,000 in repairs in order to be functional.

15. After the assessment of the engine, Gunter contacted Morgan with the information provided by Reher-Morrison. In response, Morgan accused Gunter and the mechanics at Reher-Morrison of being ignorant of pro-stock engines. Morgan offered to take the engine back to fix it himself. Gunter returned the engine to Morgan for repair in March, 2016. After taking possession of the engine from Gunter, Morgan blocked Gunter from calling his phone and he has since neglected to return the completed engine or refund Gunter's money for the engine, or any other component or equipment that Morgan sold to Gunter. Morgan has since contacted Gunter asking how much Gunter wants for the engine. To date, Morgan has neglected to follow up these phone calls with any meaningful action, and there is nothing to indicate that Morgan has even attempted to return a repaired engine to Gunter, or to re-sell the engine and return to Gunter the money he originally paid for the engine.

## CAUSES OF ACTION

A. **Violation of the Texas Deceptive Trade Practices Act**

1. **Laundry List Violations**

16. Plaintiff Jody Gunter is a consumer under the DTPA because he is an individual who acquired goods in the form of an automobile engine, among other parts, as promised by Defendant, Larry Morgan. Defendant violated the DTPA when he engaged in false, misleading or deceptive acts or practices that the Plaintiff relied on to his detriment. Specifically, Defendant engaged in one or more of the following deceptive acts or practices:

> a. Defendant represented that the engine, and the other parts and equipment sold to Plaintiff had certain characteristics and benefits that they did not have. *See* TEX. BUS. & COMM. CODE § 17.46(b)(5). Specifically, during the sale of the engine, Defendant told Plaintiff that he had held one of his best engines back to sell to the Plaintiff. Defendant convinced Plaintiff that the engine was in excellent condition and that it was ready to serve Plaintiff's intended purposes. The engine that was delivered was not even functional upon delivery, and it would have required extensive repairs to run correctly.
>
> b. Defendant represented to Plaintiff that the engine was of a particular standard or quality, when in fact it was defective. *See* TEX. BUS. & COMM. CODE § 17.46(b)(7).

Specifically, Defendant informed Plaintiff that the engine was of high quality and in excellent condition. The engine that was delivered was defective and totally unfit for Plaintiff's stated purposes. The other parts that Defendant sold to Plaintiff were likewise of a lower quality than advertised.

      c.      Defendant advertised an engine that he did not intend to sell as advertised. *See* TEX. BUS. & COMM. CODE § 17.46(b)(9). Specifically, the high-quality engine that Defendant advertised to Plaintiff was not the engine that he delivered to Plaintiff. The parts sold to Plaintiff throughout the entire process were consistently of a lower quality than Defendant promised. At every step, Plaintiff relied on the assurances of the more experienced Defendant.

      d.      Defendant failed to disclose information known to him at the time of the transactions, and this failure was intended to induce the Plaintiff to enter into the transactions. *See* TEX. BUS. & COMM. CODE § 17.46(b)(24). Specifically, Defendant knew that Plaintiff was looking for quality parts and an engine to use in a pro-stock drag racing automobile, and he knew that the engine he would deliver to Plaintiff was in need of extensive repair in order to fill that role. Defendant intentionally misled Plaintiff regarding the condition of the engine in order to induce the Plaintiff to make the purchase.

**2.    DTPA Warranties**

17.    Aside from the above laundry list of violations of the DTPA, Defendant has also breached express and implied warranties under the DTPA. *See* TEX. BUS. & COM. CODE §17.50(a)(2). Defendant breached the express warranty of goods by making representations to the Plaintiff regarding the nature and quality of the parts and the engine Defendant sold to the Plaintiff. The statements made by Defendant detailing the quality and value of the parts and the engine formed the basis of the bargain between Plaintiff and Defendant. For example, originally, Plaintiff merely intended to lease the engine from the Defendant, but, as a result of Defendant's promises about the engine's condition, quality, and value, Plaintiff decided instead to purchase the engine. Upon delivery of the engine, the Plaintiff was informed that the engine was severely defective and would require $25,000.00 in repairs.

18.    Further, Defendant breached the implied warranties of merchantability and fitness. Specifically, Defendant breached the implied warranty of fitness because the parts and engine sold to Plaintiff were completely unfit to be used in a competition drag racing automobile, and Defendant neglected to make any attempt to remedy these defects after Plaintiff notified him of the deficiencies.

19. Additionally, Defendant breached the implied warranty of merchantability because, as described above, the engine was unfit for the ordinary purposes of a pro-stock drag racing engine, needing extensive repairs to meet even average standards of quality. As Plaintiff would find out, Defendant had been supplying Plaintiff with substandard parts and equipment throughout the entire process. Defendant described the engine as being a top-quality engine that was a steal at the price at which he was selling it, however the engine delivered to the Plaintiff was practically worthless as a racing engine. The engine delivered to the Plaintiff did not conform to promises made by Defendant, was far below the average quality of the sort of engine Plaintiff was led to believe he was purchasing, and it, along with the other parts sold to Plaintiff by Defendant, was in no way fit for Plaintiff's ordinary and intended purposes.

**3.    Unconscionable Conduct**

20. In addition to the laundry list violations and his breach of express and implied warranties, Defendant Larry Morgan also violated the DTPA when he engaged in an unconscionable action or course of action that, to the Plaintiff's detriment, took advantage of the Plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Defendant's unconscionable course of action is well documented. Defendant used outright lies and deception to induce Plaintiff into sales that Plaintiff originally had no interest in. Defendant even went so far as to produce fraudulent dynamometer sheets to prove the engine's alleged quality. Immediately after Plaintiff confronted Defendant with the opinions of the mechanics at Reher-Morrison, the Defendant cut ties with the Plaintiff, severing their personal and professional relationship and forcing Plaintiff to seek legal remedy to account for his losses.

21. Defendant's wrongful conduct was a producing cause of the Plaintiff's damages which he seeks to recover as detailed below.

**B.**     **Fraud**

22.     Defendant made multiple material representations to Plaintiff regarding the parts and equipment being supplied by the Defendant. Specifically, Defendant assured Plaintiff that the parts and the engine were high-quality and in extremely good condition. This representation was material because it induced Plaintiff to continue to purchase these parts, and more importantly to purchase the engine itself rather than lease it as he had originally planned. On information and belief, the representations made by the Defendant about the engine sold to the Plaintiff were false. An assessment by the Reher-Morrison mechanics in Arlington, Texas confirmed the Defendant's fraudulent conduct regarding the quality of the engine he had purchased directly from the Defendant, an engine that he had never run or had installed into a vehicle. Defendant made those statements to deliberately mislead the Plaintiff into purchasing the engine rather than leasing it, knowing that the engine that Plaintiff would receive was in poor condition and needed extensive repairs to function properly.

**C.**     **Breach of Contract**

23.     Plaintiff and Defendant entered into numerous agreements regarding the Defendant's purchase of various parts and pieces of equipment for Plaintiff's pro-stock racing project. Most of these purchases involved parts or equipment that were far below the standard that Defendant had advertised. The most notable of these transactions was the oral agreement for Plaintiff to purchase Defendant's engine for a total of $35,000 ($12,000 of which Plaintiff had already paid to Defendant for the lease of the same engine). Plaintiff fully performed his contractual obligation by tendering payment of the remaining $23,000 balance to Defendant. Defendant breached the contract when he delivered a defective engine to the Plaintiff in October of 2015. The engine delivered to Plaintiff needed substantial repair upon delivery, and was wholly unsuitable for Plaintiff's intended purposes. The engine that Plaintiff had specifically contracted Defendant to supply in no way resembled the

engine ultimately delivered to the Plaintiff, therefore the Defendant breached his contract with the Plaintiff.

24. Defendants' breaches have caused Plaintiff damages in the amount of the sale price of the various parts and equipment, including the engine sold to Plaintiff for $35,000, in addition to the costs incurred by the Plaintiff in having the engine inspected and finally returned to the Defendant.

## JURY DEMAND

25. Plaintiff asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## REMEDIES

26. **Actual Damages.** Plaintiff seeks the recovery of his actual damages, which in this case would be the money he paid for the engine, equipment and other parts, and his costs in shipping, inspecting, and returning the engine and any other returned parts or equipment purchased from Mr. Morgan. Such costs are estimated to be at least $36,500 for the engine itself.

27. **Mental Anguish Damages.** Plaintiff seeks to recover mental anguish damages because Defendant's wrongful conduct was committed knowingly and intentionally. Defendant undertook a campaign of persuasion and deception to induce Plaintiff into spending large sums of money to begin a racing project solely for the purpose of defrauding Plaintiff slowly over time by brokering used and substandard parts at new-part prices. In this case, it may be inferred from Defendant's actions that he acted with deception, awareness and unfairness in connection with his manifestations of the quality and the actual condition of various parts and equipment, most notable the engine, upon delivery.

28. **Treble Damages.** In addition to the actual and consequential damages stated above, the Plaintiff seeks to recover treble damages as provided under the DTPA based on Defendant's intentional conduct.

29. **Loss of Income.** As a direct and proximate result of Defendant's deception and misconduct, Plaintiff invested large sums of money to be able to compete in pro-stock racing events. Not only did these events come with the possibility of financial gain based on performance, they also served as a means by which Plaintiff could advertise his business and expand his reputation in the automotive community. Defendant's misconduct and deception prevented Plaintiff form participating in a race, and damaged his reputation in the racing community.

30. **Punitive Damages.** Plaintiff seeks to recover punitive damages as a result of Defendant's wantonly fraudulent or intentional conduct.

31. **Rescission**. In the alternative, Plaintiff seeks rescission of the contract entered into for purchase of the engine, and all other agreements relating to the purchase of pro-stock racing parts. Defendant deliberately induced Plaintiff into investing in pro-stock racing so that he could sell him all manner of parts and equipment, most notably the engine, at a level far below the quality advertised. Defendant made these false representations to the Plaintiff so that Plaintiff would continually provide Defendant with money that was ultimately used for Defendant's benefit while he left Plaintiff with sub-standard and used parts and equipment. Plaintiff relied on Defendant's advice as an experienced pro-stock racer and friend without suspecting Defendant's true motivations behind the entire pro-stock endeavor. If rescission of these contracts is not granted, and Plaintiff's out-of-pocket damages are not returned, Plaintiff will suffer substantial financial injury, compounded by the loss of his time, damage to his reputation, and the missed business opportunities that stem from Defendant's deception. Because of Defendant's fraudulent conduct, and as a result of his violations of the Texas Deceptive Trade Practices Act, Plaintiff is entitled to rescission of the contract as an alternative remedy.

32. **Attorney's Fees.** Plaintiff also seeks to recover his reasonable and necessary attorney's fees incurred in the prosecution of this matter, as well as an additional sum of attorney's fees and costs in the event this matter is appealed to higher courts.

## PRAYER

33. For these reasons, Plaintiff asks that he be awarded a judgment, jointly and severally, against Defendant Larry Morgan individually and as Larry Morgan Racing, Inc. for the following:

   a. Actual damages;

   b. Punitive and/or treble damages;

   c. Alternatively, rescission of the contract and out-of-pocket damages.

   d. Prejudgment and post-judgment interest;

   e. Reasonable and necessary attorney fees;

   f. Court costs; and

   g. All other relief to which Plaintiff is entitled.

Respectfully submitted,

By: /s/ Jim Hering
**JIM HERING**
Bar Card No. 00796744

**TRAVIS BLAKE**
Bar Card No. 24105477

**PAKIS, GIOTES, PAGE & BURLESON, P.C.**
400 Austin Avenue, Suite 400
Post Office Box 58
Waco, Texas 76703-0058
(254) 297-7300
(254) 297-7301 *Facsimile*
hering@pakislaw.com
blake@pakislaw.com
Attorneys for *Jody Gunter, Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of January 2017, I electronically filed the foregoing document with the Clerk of the Court, in compliance with Rule 5 of the Federal Rules of Civil Procedure, using the CM/ECF system which will send notification of such filing to all parties as follows:

**Brandon Oates**
Haley & Olson, P.C.
100 N. Ritchie Rd., Ste. 200
Waco, Texas 76712
boates@haleyolson.com


　　　　　　　　　　　　　　　　　　　　　　　　　　**/s/ Jim Hering**

{GUNTJO/00003/00345548}